UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

ALEUT SUPPORT SERVICES, LLC,

    Plaintiff,

  v.

STATIONARY ENGINEERS, LOCAL 39, et al.,

    Defendants.

Case No. 15-cv-03348-WHO

**ORDER DENYING MOTION FOR PRELIMINARY INJUNCTION**

Re: Dkt. No. 16

## INTRODUCTION

This case concerns two upcoming arbitrations. The first, set for September 21, 2015, is between Aleut Support Service, LLC ("Aleut") and three employee-benefit funds[1] associated with Stationary Engineers Local 39 ("Local 39"). The second, set for October 8, 2015, is between Aleut and Local 39.

Aleut filed this action under section 301 of the Labor Management Relations Act ("LMRA"), 29 U.S.C. § 185, to compel the Trust Funds and Local 39 to combine the two arbitrations scheduled between the parties into a single tripartite arbitration. Aleut now moves for a preliminary injunction prohibiting the Trust Funds and Local 39 from proceeding with (or, in the alternative, an order staying) the two arbitrations pending the resolution of this lawsuit.

Neither of the relevant arbitration agreements provides for tripartite arbitration. Lacking a contractual basis for its request, Aleut bases its motion on a line of cases requiring extracontractual tripartite arbitration to resolve disputes between two unions and a common employer over which

---

[1] The employee-benefit funds are Stationary Engineers Local 39 Pension Trust Fund, Stationary Engineers Local 39 Defined Contribution Annuity Trust Fund, and Stationary Engineers Local 39 Health and Welfare Trust Fund. Compl. ¶ 3 (Dkt. No. 1). Each is a multiemployer trust fund established under the LMRA and the Employee Retirement Income Security Act ("ERISA"). *Id.* I refer to them collectively in this Order as the "Trust Funds."

union was entitled to provide employees for a certain work assignment. Those cases are very different from this one, and Aleut offers little justification for applying them here. Further, even if the cases were applicable, the discretionary factors they set out do not favor compelling arbitration in the circumstances of this action. Aleut has not made a clear showing of likelihood of success or serious questions going to the merits. Its motion is DENIED.

## BACKGROUND

The facts of this case are largely undisputed. Aleut delivers base-operations support, grounds maintenance, and logistics/supply services to federal agencies, including the General Services Administration ("GSA"). Compl. ¶ 11. Local 39 represents approximately 11 individuals currently employed by Aleut on a GSA contract in Sacramento, California. *Id.* ¶ 12.

Aleut and Local 39 are parties to a collective bargaining agreement ("CBA"). *Id.* ¶ 13. The CBA requires Aleut to contribute to each of the Trust Funds. *Id.* ¶ 17. It also sets out a grievance procedure to resolve claimed violations of the CBA through final and binding arbitration before an impartial arbitrator. *Id.* ¶ 15-16.

The CBA requires Aleut to adhere to the obligations imposed on employers by the "Trust Agreements" underlying the Trust Funds. *Id.* ¶ 18. Each of the Trust Agreements provides for an "expedited arbitration" procedure under which the Trust Funds may set an arbitration before an arbitrator to recover allegedly delinquent contributions from employers. Hill Decl. ¶ 5 (Dkt. No. 16-1); Trust Funds Opp. at 5 (Dkt. No. 25). Each of the Trust Agreements also includes the following provision:

> The Board of Trustees shall have the right, authority, and duty, in the name of the Fund or otherwise, as in its discretion may be deemed necessary or desirable, to demand and enforce the prompt payment of contributions to the Fund . . . , without being limited or restricted by [any] grievance or arbitration procedures provided in a [CBA]."

Besocke Decl. Ex. C, Art. IV § 4.03 (Pension Trust Fund Agreement) (Dkt. No. 27-3); Besocke Decl. Ex. D, Art. II § 11 (Annuity Trust Fund Agreement) (Dkt. No. 27-4); Besocke Decl. Ex. E, Art. IV § 3 (Health and Welfare Trust Agreement).

Over the past approximately 11 years (since Local 39 first began representing Aleut employees) Aleut has "from time to time" subcontracted out maintenance and repair work

required under the GSA contract. Compl. ¶ 19. Aleut states that this subcontracting has occurred "when bargaining unit employees are unavailable, in emergencies, and when bargaining unit employees do not have the skills or equipment to perform the necessary work." *Id.* No part of the CBA squarely addresses subcontracting or contribution to the Trust Funds on account of work performed by nonsignatory subcontractors. *See, e.g.,* Mot. at 3-4 (Dkt. No. 16); Trust Funds Opp. at 5.

On June 17, 2014, the Trust Funds sent to Aleut a draft audit report stating that it owed them a combined total of $132,162.97 for the period September 1, 2009 through August 31, 2013, in part because a "nonsignatory subcontractor performed work covered by the [CBA] but was not reported to the [Trust Funds]." Besocke Decl. Ex. F (Dkt. No. 27-6). On July 15, 2014, the Trust Funds billed Aleut for this amount and requested that it pay them within 30 days. Compl. ¶ 20.

On or around to August 7, 2014, Aleut wrote to the Trust Funds stating that the CBA does not require Aleut to make contributions to the Trust Funds for anyone other than bargaining unit employees. *Id.* ¶ 24. The Trust Funds responded on November 24, 2014, stating that the CBA "requires Aleut to remit contributions to the Trust Funds for all covered work described in the CBA." *Id.* ¶ 25.

Aleut subsequently contacted Local 39 "to confirm that the CBA does not require Aleut to remit contributions to the Trust Funds for work performed by nonsignatory subcontractors." *Id.* ¶ 28. On or around January 27, 2015, after Aleut and Local 39 failed to reach agreement on this issue, Aleut filed a grievance against Local 39 pursuant to the CBA. Guerin Decl. Ex. 5 (Dkt. No. 16-14). The grievance concerns "Aleut's right to subcontract out work consistent with past practice, e.g., work involving emergency situations or work requiring specialized skills or equipment, just to name the most frequently occurring situations." *Id.* On or around March 13, 25, Local 39 responded with a grievance against Aleut, requesting, in part, a declaration that "Aleut does not have the right to contract out [bargaining unit] work." *Id.* ¶ 33. Aleut and Local 39 subsequently agreed to arbitrate both of their grievances during the same arbitration. *Id.* The arbitration is currently set for October 8, 2015 before Arbitrator Margaret Brogan. *Id.* ¶ 34.

On or around May 27, 2015, after the Aleut-Local 39 arbitration had already been

3

1  scheduled, the Trust Funds informed Aleut that they had arranged an expedited arbitration
2  pursuant to the Trust Agreements for the purpose of collecting the $132,162.97 billed to Aleut. *Id.*
3  ¶ 36. That arbitration is currently set for September 21, 2015 before Arbitrator William Riker.
4  Hill Decl. ¶ 5.

On or around June 30, 2015, Aleut wrote a letter to Local 39, the Trust Funds, and Arbitrators Brogan and Riker requesting that the Aleut-Trust Funds arbitration be stayed

> pending a decision by Arbitrator Margaret Brogan in an arbitration scheduled for October 8, 2015 involving the identical issue, the same employer, the same union and the same [CBA]. In the alternative, the two arbitrations should be consolidated for a decision by Arbitrator Brogan. In the absence of a stay or an agreement to consolidate, Aleut will be forced to file an action in federal court to compel tripartite arbitration of the underlying dispute in order to avoid the risk of conflicting arbitration awards.

Compl. ¶ 37.

On July 5, 2015, Arbitrator Riker sent a letter to counsel for Aleut and counsel for the Trust Funds declining to stay or consolidate the Aleut-Trust Funds arbitration. The letter states in relevant part:

> [T]he demands of the Labor/Management Trustees who serve on the [Trust Funds] have a separate fiduciary duty from the bargaining relationship between signatory Employers to the CBA and the Union. As such the Trustees are required to assure that all monies that are due and owing by signatory employers to the [Trust Funds] are paid . . . in a timely manner, and if not, they are obligated to pursue the delinquencies through the [Trust Funds'] established collection process. Unless notified by the [Trust Funds], this arbitrator will hear the subject matter on September 4, 2015.[2]

Baldwin Decl. ¶ 10 (Dkt. No. 26).

Aleut states that "[t]his lawsuit would not have been necessary had the Trust Funds agreed to submit this dispute to tripartite arbitration . . . Now, Aleut is faced with having to proceed with two arbitrations over the same dispute, over the same contract, and involving the same facts. Aleut filed this lawsuit and submits this [motion for preliminary injunction] to avoid the risk of having to comply – in perpetuity – with two conflicting arbitration awards." Mot. at 6.

---

[2] The Aleut-Trust Funds arbitration was subsequently moved from September 4, 2015 to its current date, September 21, 2015. Baldwin Decl. ¶ 12.

4

**LEGAL STANDARD**

"[A] preliminary injunction is an extraordinary and drastic remedy, one that should not be granted unless the movant, *by a clear showing*, carries the burden of persuasion." *Mazurek v. Armstrong*, 520 U.S. 968, 972 (1997) (emphasis in original). "A plaintiff seeking a preliminary injunction must establish that he is likely to succeed on the merits, that he is likely to suffer irreparable harm in the absence of preliminary relief, that the balance of equities tips in his favor, and that an injunction is in the public interest." *Winter v. Natural Res. Def. Council, Inc.*, 555 U.S. 7, 20 (2008). Alternatively, if the plaintiff cannot establish that he is likely to succeed on the merits, he may still obtain an injunction if he shows that he has raised "serious questions going to the merits" and that the balance of hardships "tips sharply" in his favor, so long as he also shows that the other two *Winter* factors are satisfied, i.e., that there is a likelihood of irreparable injury and that the injunction is in the public interest. *See Alliance for the Wild Rockies v. Cottrell*, 632 F.3d 1127, 1131-35 (9th Cir. 2011); *accord Angelotti Chiropractic, Inc. v. Baker*, 791 F.3d 1075, 1081 (9th Cir. 2015).

**DISCUSSION**

"No obligation to arbitrate a labor dispute arises solely by operation of law. The law compels a party to submit his grievance to arbitration only if he has contracted to do so." *Gateway Coal Co. v. United Mine Workers of Am.*, 414 U.S. 368, 374 (1974). The parties do not dispute that neither of the relevant arbitration agreements provides for tripartite arbitration. Accordingly, in arguing that there is a likelihood of success on the merits, Aleut relies on *United States Postal Service v. American Postal Workers Union, AFL-CIO*, 893 F.2d 1117 (9th Cir. 1990), and other cases requiring extracontractual tripartite arbitration to resolve "work assignment" or "jurisdictional" disputes between two unions and a common employer over which union had the exclusive right to provide employees for a certain work assignment. For the reasons discussed below, those cases do not entitle Aleut to a preliminary injunction.

*U.S. Postal Service* concerned a work assignment dispute between the American Postal Workers Union ("APWU"), the National Post Office Mail Handlers, Watchmen, Messengers, and Group Leaders Division of the Laborers' International Union of North America ("Mail

5

Handlers"), and the United States Postal Service ("USPS"). The APWU and the Mail Handlers both represented USPS employees. Their respective CBAs with the USPS were "virtually identical." *Id.* at 1119. When the USPS assigned work at one of its facilities to members of the Mail Handlers, the APWU filed a grievance, claiming that the work should have been assigned to its members. *Id.* An arbitration between the APWU and the USPS was scheduled, and when the Mail Handlers attempted to intervene, the arbitrator concluded that their intervention was not allowed under the APWU-USPS agreement. *Id.* The USPS subsequently filed an action in federal district court and obtained an order compelling tripartite arbitration between the parties. *Id.*

The Ninth Circuit affirmed on appeal. It applied a two-part analysis to determine whether the tripartite arbitration order was appropriate. First, it held that "[f]or the district court to have the power to compel tripartite arbitration, a contractual nexus is required as to both (a) the parties and (b) the subject matter . . . Here, the requisite contractual nexus is present: all of the parties have agreed to the arbitration of the merits of the current dispute." *Id*. at 1120.

Second, it held that a district court "must examine other factors to ensure that tripartite arbitration is a suitable remedy for the actual case before it . . . These factors include (a) the nature of the relevant arbitration provisions, (b) the invocation of each arbitration provision by a party to the agreement, and (c) any procedural concerns surrounding the implementation of tripartite arbitration." *Id.* at 1120. In addition, "the conclusions of the arbitrator should be considered." *Id.* at 1121.

The Ninth Circuit found that these discretionary factors favored tripartite arbitration in the case before it because (a) both CBAs contained identical "broad arbitration provisions" that "expressed a strong general preference for arbitration of contractual disputes;" (b) the APWU and the Mail Handlers had both invoked the arbitration provisions in their respective CBAs; (c) there were no "procedural difficulties," in that the Mail Handlers had agreed to follow the arbitration procedures in the APWU-USPS agreement, so the APWU would "not be prejudiced by any alterations to the procedural structure of the arbitration to which it agreed;" and (d) while the arbitrator had rejected the Mail Handlers' attempt to intervene, he had "expressed his view that tripartite arbitration would be appropriate" – for example, by expressing concerns "about the

6

fundamental fairness of a grievance arbitration wherein the employer rather than the union represents the interests of certain employees." *Id.*

The Ninth Circuit also observed that

> [c]ompelling all three parties in this case to submit their grievance to the same arbitration is practicable, economical, convenient, and fair. It not only avoids duplication of effort, but also avoids the possibility of conflicting awards. In our circuit, the possibility of conflicting awards is a serious threat because of our decision in *Louisiana-Pacific Corp. v. International Bhd. of Electrical Workers*, 600 F.2d 219 (9th Cir. 1979). Parties must request court intervention before receiving conflicting awards, otherwise the conflicting awards will stand – even if [they] claim to apply the same substantive rule.

*Id.* at 1121.[3]

Other circuit court cases recognizing a district court's power to compel tripartite arbitration, even in the absence of explicit contractual authorization, have likewise involved work assignment disputes between two unions and a common employer. *See, e.g., Local 1351 Int'l Longshoremens Ass'n v. Sea-Land Serv. Inc., Carriers' Container Council*, 214 F.3d 566, 571-72 (5th Cir. 2000) (observing that tripartite arbitration is "generally favored" in cases where two unions have received conflicting arbitration awards, or where one union is seeking to be awarded work that may result in a grievance from another); *U.S. Postal Serv. v. Nat'l Rural Letter Carriers' Ass'n*, 959 F.2d 283, 286-88 (D.C. Cir. 1992) ("[A] court has the authority to order tripartite arbitration of a dispute between two unions and their employer where both unions are subject to a collective bargaining agreement with the employer and both agreements contain similar provisions requiring arbitration of the dispute."); *Retail, Wholesale & Dep't Store Union, Local 390 v. Kroger Co.*, 927 F.2d 275, 286-88 (6th Cir. 1991); *Local No. 850, Int'l Ass'n of Machinists & Aerospace Workers v. T.I.M.E.-DC, Inc.*, 705 F.2d 1275, 1277-78 (10th Cir. 1983);

---

[3] In *Louisiana-Pacific*, the Ninth Circuit considered a situation where an employer became "subject to two arbitration awards under two separate collective bargaining agreements which have obligated it to pay in a jurisdictional dispute two different sets of employees for the work of one." 600 F.2d at 219. In affirming the district court's refusal to set aside the two arbitration awards and order tripartite arbitration, the Ninth Circuit recognized "[t]he desirability of tripartite arbitration in jurisdictional disputes over work assignments" but held that the employer's failure to seek court intervention before the arbitrations occurred "prevent[ed] it from claiming any injustice" in the conflicting awards. *Id.* at 222, 226.

7

*Columbia Broad. Sys., Inc. v. Am. Recording & Broad. Ass'n*, 414 F.2d 1326, 1328-29 (2d Cir. 1969); *see also Miron Const. Co. v. Int'l Union of Operating Engineers, Local 139*, 44 F.3d 558, 563 (7th Cir. 1995) (noting that "[a]lthough some courts have considered tripartite arbitration without a contractual mechanism, these cases have been carefully limited to classic one-on-one jurisdictional disputes where each union explicitly claims the work is covered under the terms of its agreement").

There are two problems with Aleut's reliance on *U.S. Postal Service* and other work assignment cases. The first is that this action does not involve a work assignment dispute. Aleut does not cite any decision, either from the appellate or trial court level, holding that extracontractual tripartite arbitration may be compelled in a nonjurisdictional dispute involving an employee-benefit fund. Aleut includes a section in its reply brief entitled, "The Federal Common Law Allowing Courts To Compel Tripartite Arbitration Is Applicable To This Case Even Though It Is Not A Work Jurisdiction Dispute." Reply at 11-12 (Dkt. No. 28). But the section is virtually devoid of citations to case law or other authority. *See id.* Aleut cites to *Local No. 552, United Brick & Clay Workers of Am., AFL-CIO v. Hydraulic Press Brick Co.*, 371 F. Supp. 818 (E.D. Mo. 1973), in which the court compelled tripartite arbitration between a union, a past employer, and a present employer to resolve a dispute over vacation pay. *Id.* at 821, 825-26. Pointing to *United Brick,* Aleut announces that "at least one federal court has granted tripartite arbitration over a non-work-jurisdiction dispute." Reply at 11. That is true. But *United Brick* is an out-of-circuit district court case from more than 40 years ago that, in any event, does not involve tripartite arbitration with an employee-benefit fund (which is a significant distinction, as discussed below). It does not imply, much less establish, that tripartite arbitration may be compelled here. Aleut cites no other tripartite arbitration decision that does not involve a work assignment dispute.

Aleut notes that *U.S. Postal Service* does not explicitly hold that the existence of a jurisdictional dispute is a factor or requirement for compelling tripartite arbitration. Reply at 12. In the same vein, it contends that here, as in *U.S. Postal Service*, compelling tripartite arbitration would be "practicable, economical, convenient, and fair." *Id.* Aleut's position is essentially that there is no reason not to extend *U.S. Postal Service* to this case.

8

While I recognize that tripartite arbitration in this case would likely be economical and convenient for Aleut, I disagree that this provides sufficient justification for applying *U.S. Postal Service*. Jurisdictional disputes raise very different concerns from disputes with employee-benefit funds over benefit contributions. In *Schneider Moving & Storage Co. v. Robbins*, 466 U.S. 364 (1984), the Supreme Court considered whether the trustees of two multiemployer trust funds could enforce the terms of their trust agreements against employers without first submitting to arbitration underlying disputes over the meaning of certain terms in the employers' collective bargaining agreements. *Id.* at 365. In ruling that they could, the Court held that the presumption in favor of arbitrability that generally applies in labor disputes (because it "furthers the national labor policy of peaceful resolution of labor disputes and thus best accords with the parties' presumed objectives in pursuing collective bargaining") does not apply to disputes between employee-benefit funds and employers. *Id.* at 371-72. The Court explained that employee-benefit funds are in a substantially different position than unions with respect to labor disputes:

> Arbitration promotes labor peace because it requires the parties to forgo the economic weapons of strikes and lockouts. Because the trustees of employee-benefit funds have no recourse to either of those weapons, requiring them to arbitrate disputes with the employer would promote labor peace only indirectly, if at all. We conclude, therefore, that the presumption of arbitrability is not a proper rule of construction in determining whether arbitration agreements between the union and the employer apply to disputes between trustees and employers, even if those disputes raise questions of interpretation under the collective-bargaining agreements.

*Id.* (internal footnotes omitted). The Court then held that, absent the presumption in favor of arbitrability, the trust and collective bargaining agreements at issue did not evince an intent to require the trustees to arbitrate disputes with employers. It stated:

> These are multiemployer trust funds. Each of the participating unions and employers has an interest in the prompt collection of the proper contributions from each employer. Any diminution of the fund caused by the arbitration requirements of a particular employer's collective-bargaining agreement would have an adverse effect on the other participants. The enforcement mechanisms established in the trust agreements protect the collective interests of the parties from the delinquency of individual employers by allowing the trustees to seek prompt judicial enforcement of the contribution requirements. It is unreasonable to infer that these parties would agree to subordinate those mechanisms to whatever arbitration procedures might be required by a particular employer's

9

> collective-bargaining agreement. In the absence of evidence to the contrary, therefore, we will not infer that the parties to the two multiemployer trust funds intended to condition the trustees' enforcement authority on the arbitration procedures contained in petitioners' separate collective-bargaining agreements.

*Id.* at 373-74 (internal footnotes omitted).

Relying in part on *Schneider*, the Supreme Court again highlighted the distinction between unions and employee-benefit funds in *Central States, Southeast & Southwest Areas Pension Fund v. Central Transport Inc.*, 472 U.S. 559 (1985), where it held that a multiemployer trust fund must be allowed to audit the records of an employer who denies that certain of its employees are plan participants. The Court stated in relevant part:

> The notion that federal policy favors union enforcement of an employer's collectively bargained obligations to a benefit plan, to the exclusion of enforcement by the plan's trustees, simply did not survive last term's decision in [*Schneider*]. In *Schneider*, we held that a benefit plan could bring an independent action for judicial enforcement of an employer's trust obligations, and we in large part relied on the proposition that there was no federal policy favoring trustee dependence on a union's use of a grievance and arbitration system for such enforcement.
>
> Of greatest significance here is this Court's conclusion that compelling benefit plans to rely on unions would erode the protections ERISA assures to beneficiaries, for the diminishment of trustee responsibility that would result would not necessarily be made up for by the union. ERISA places strict duties on trustees with respect to the interests of beneficiaries, and unions' duties toward beneficiaries are of a quite different scope.
>
> A trustee's duty extends to all participants and beneficiaries of a multiemployer plan, while a local union's duty is confined to current employees employed in the bargaining unit in which it has representational rights. The breadth of the trustee's duty may result in a very different view of the special situations that may exist in any single unit, and, as we recognized in *Schneider*, a union's arrangements with a particular employer might compromise the broader interests of the plan as a whole . . .

*Id.* at 575-76 (internal footnotes omitted).[4]

There are obvious differences between this case and *Schneider* and *Central States*, including that the Trust Agreements, unlike the agreements at issue in *Schneider*, do include procedures for the arbitration of disputes over delinquent contributions. *Schneider* and *Central States* are nevertheless instructive. They indicate that the interests that favor arbitration of disputes between unions and employers do not necessarily apply to disputes involving employee-benefit funds, and, moreover, that an employee-benefit fund's ability to collect delinquent contributions should not be subordinated to or made dependent on the actions of a union.[5] In light of these points, I am persuaded that *U.S Postal Service* should not be extended to circumstances like those at issue here, merely because the employer contends that tripartite arbitration will be practicable, economical, convenient, and fair.[6]

The second problem with Aleut's reliance on *U.S. Postal Service* and other work assignment cases is that the *U.S. Postal Service* analysis does not favor tripartite arbitration here. A court may only compel tripartite arbitration where there exists a "contractual nexus" as to both the parties and the subject matter. *U.S. Postal Service*, 893 F.2d at 1120. In a work assignment dispute, the subject matter requirement is generally satisfied because of the clear overlap between the two unions' quarrels with their employer, and the danger that the direct and immediate result

---

[4] In line with *Schneider* and *Central States*, courts have held that an employee-benefit fund is not equitably estopped from enforcing a contribution agreement based the actions of a union, and that an employee-benefit fund is not precluded from relitigating issues that a union has litigated and lost. *See Operating Engineers Pension Trust v. Cecil Backhoe Serv., Inc.*, 795 F.2d 1501, 1507 (9th Cir. 1986) ("The primary failing of [the employer's] estoppel argument is that it focuses almost exclusively on what the *union* or its representatives knew or intended, rather than on what the *trust funds* knew or intended.") (emphasis in original); *Moldovan v. Great Atl. & Pac. Tea Co. Inc.*, 790 F.2d 894, 899 (3d Cir. 1986) ("There is in every instance of a multiemployer benefit plan, and in every instance of even a single employer benefit plan which includes retirees among its beneficiaries, a conflict between the interests of the fund and the interests of the members of a bargaining unit so fundamental that as a matter of due process the union representing employees in that unit cannot ever be deemed the representative of the fund.").

[5] Arbitrator Riker made similar points in declining to stay or consolidate the Aleut-Trust Funds arbitration. *See* Baldwin Decl. ¶ 10.

[6] At oral argument, counsel for Aleut also revealed his concern that Arbitrator Riker would be biased against Aleut given his "institutional relationship" with the Trust Funds. That is not an appropriate basis for compelling tripartite arbitration. If Aleut is not happy with the arbitration procedures set out in the Trust Agreements, it should renegotiate those procedures.

11

of their respective arbitrations will be to place the employer in an impossible or irreconcilable situation.

Here, on the other hand, the extent to which the issues to be arbitrated overlap with one another is not at all clear. On their face, the issues appear distinct: The Aleut-Local 39 arbitration concerns whether Aleut has the right *going forward* to hire subcontractors for work on the GSA contract, while the Aleut-Trust Funds arbitration concerns whether Aleut must contribute to the Trust Funds for work performed by subcontractors on the GSA contract *for the period September 1, 2009 through August 31, 2013*. It may be that both of these issues will turn on the arbitrator's construction of the same or similar terms or provisions of the CBA. But Aleut has not stated that this is the case, much less identified what those terms or provisions are likely to be or how they are likely to be relevant to each arbitrator's ultimate decision. Moreover, even if the arbitrators do consider similar evidence and/or contractual language in reaching their respective decisions, the arbitrations can still only result in awards that apply inconsistent reasoning; their direct and immediate practical effects – which will be limited to prospective relief on the one hand and retrospective relief on the other – cannot overlap. *U.S. Postal Service* and the other work assignment cases that Aleut relies on, however, concern arbitration awards that created conflicts in their immediate practical impact, not in their underlying reasoning. *Cf. In re United Pub. Workers, AFSCME, Local 646, AFL-CIO*, 244 P.3d 609, 617 (Haw. Ct. App. 2010) (declining to compel tripartite arbitration in part because it was "possible for the [employer] to fully comply with both [arbitration awards]," and thus "[t]he fundamental purpose of tripartite arbitration – to avoid conflicting arbitration awards that lock the employer in an impossible position – [was] not met").

Before ordering tripartite arbitration, the court must also consider several additional factors, including "any procedural concerns surrounding the implementation of tripartite arbitration" and "the conclusions of the arbitrator." *Id.* at 1121. These additional factors cut further against tripartite arbitration. In contrast with *U.S. Postal Service*, where one of the unions agreed to follow the arbitration procedures of the other, neither Local 39 nor the Trust Funds has agreed to adhere to the other's arbitration procedures. As Local 39 details in its opposition brief,

12

there are significant differences between the arbitration procedures set out in the CBA versus the Trust Agreements. *See* Local 39 Opp. at 7 (Dkt. No. 24) (citing differences with respect to method of selecting arbitrator, division of costs, and timing of arbitration proceedings and award). And, as the Trust Funds highlight, the Trust Agreements grant them the explicit "right, authority, and duty . . . to demand and enforce the prompt payment of contributions . . . , without being limited or restricted by [any] grievance or arbitration procedures provided in a [CBA]."  Besocke Decl. Ex. C, Art. IV § 4.03 (Pension Trust Fund Agreement) (Dkt. No. 27-3); Besocke Decl. Ex. D, Art. II § 11 (Annuity Trust Fund Agreement) (Dkt. No. 27-4); Besocke Decl. Ex. E, Art. IV § 3 (Health and Welfare Trust Agreement).  Forcing the Trust Funds into tripartite arbitration would be in plain conflict with this provision. *See United Indus. Workers, Serv., Transp., Pro'l & Gov't of N. Am., Atl., Gulf Lakes & Inland Waters Dist., AFL-CIO v. Kroger Co.*, 900 F.2d 944, 948 (6th Cir. 1990) (affirming district court's refusal to compel tripartite arbitration where the two unions' CBAs provided for conflicting methods of selecting the arbitrator; stating, "[O]ur power does not extend to forcing parties into types of arbitration that contradict their collective bargaining agreement").

Further, unlike the arbitrator in *U.S. Postal Service*, Arbitrator Riker did not decline to stay or consolidate the Aleut-Trust Funds arbitration on the basis of a technical reading of the Trust Agreements, while "express[ing] his view that tripartite arbitration would be appropriate."  893 F.3d at 1121.  To the contrary, using language reminiscent of *Schneider* and *Central States*, he rejected Aleut's request on the ground that it would be inappropriate to force the Trust Funds to arbitrate with Local 39, when the Trust Funds have a "separate fiduciary duty" from Local 39 that requires them "to pursue delinquencies through [their] established collection process."  Baldwin Decl. ¶ 10.  Arbitrator Riker's opinion adds further support for declining to compel tripartite arbitration here.

For all these reasons, Aleut has not demonstrated either a likelihood of success or the lower threshold of serious questions going to the merits.  Where the plaintiff is unable to establish this first requirement, the court need not review the other factors, and the request for a preliminary injunction must be denied.  *See Rubin ex rel. N.L.R.B. v. Vista Del Sol Health Servs., Inc.*, 80 F.

1  Supp. 3d 1058, 1075 (C.D. Cal. 2015); *see also Valentino v. Select Portfolio Servicing, Inc.*, No.

2  14-cv-05043-JCS, 2015 WL 1906122, at *5 (N.D. Cal. Apr. 24, 2015) (denying request for

3  preliminary injunction based only on movant's failure to establish likelihood of success of serious

4  questions going to the merits).  Aleut's failure to make a clear showing of likelihood of success or

5  serious questions going to the merits dooms its motion.

## CONCLUSION

Accordingly, Aleut's request for a preliminary injunction is DENIED.

**IT IS SO ORDERED**.

Dated: September 18, 2015



WILLIAM H. ORRICK
United States District Judge